In the Matter of the Probate of the Will of MARY SNELLING.

The fact that a will was executed by a woman of advanced age, somewhat
    enfeebled in body and mind, and that instead of giving her property to
    collateral relatives she gave it to strangers, from motives of gratitude or
    affection, does not show testamentary incapacity to execute the will.    If
    her mental powers enabled her to understand and appreciate the amount
    and condition of her property, and the nature and consequences of her
    act in executing the will, and this was her own free act, the will is
    valid.
What the law terms undue influence must be such as overpowers the will
    of a testator and subjects it to the will and control of another; it is not
    established by proof simply tending to show that the testator, acting
    from motives of affection or gratitude, gave his property to strangers
    to his blood.
On the hearing before a surrogate, on probate of a will, which was con-
    tested on the ground of mental incapacity, after two witnesses produced
    by contestants had testified to various acts and declarations of the testa-
    trix, the proponents called physicians who, after testifying that they
    had read the whole of the testimony of said witnesses, were asked and
    permitted, under objection and exception, to give their opinions as to
    the mental condition of the testatrix, assuming this testimony to be
    true, and basing their opinion thereon.    *Held*, error.
It is competent to show by cross-examination of a subscribing witness to
    a will that he has received or been promised a reward for giving
    testimony, and if this is denied by the witness, admissions or declara-
    tions to that effect, made by the witness out of court, may be proved.

(Argued December 13, 1892; decided January 17, 1893.)

APPEAL from judgment of the General Term of the Supreme
Court in the second judicial department, entered upon an order
made February 8, 1892, which affirmed a decree of the surro-
gate of Suffolk county admitting to probate the will of Mary
Snelling, deceased.

The facts, so far as material, are stated in the opinion.

*L. R. Beckley* for appellants.    There was undue influence
exercised in the execution of the will and the burden of
giving a reasonable explanation rests upon proponents.
(*In re Budlong*, 126 N. Y. 433 ; 1 Redf. on Wills, 314,

316–323; 2 Whart. on Ev. 897; Abb. Tr. Ev. 133, 134, 135; *Horn* v. *Pollman*, 72 N. Y. 269; Code Civ. Pro. §§ 2586–2588; *Plyer* v. *G. A. Ins. Co.*, 121 N. Y. 362; *Marx* v. *McGlynn*, 88 id. 357; *Mowry* v. *Silber*, 2 Bradf. 133.)

*Thomas Young* for respondents. The testatrix was of sound mind and under no influence, undue or otherwise. (*Horn* v. *Pollman*, 72 N. Y. 276; *Potter* v. *McAlpine*, 3 Dem. 114; *Marx* v. *McGlynn*, 88 N. Y. 370.) The appellant is not in a situation to attack the findings nor the refusals to find on this appeal. He has neither taken nor filed any exception thereto. This is necessary to enable him to review such findings on appeal. (Code Civ. Pro. §§ 994, 2545; Redf. L. & P. 112, 113; *In re Sprague*, 35 N. Y. S. R. 450; 125 N. Y. 732; *Angevine* v. *Jackson*, 103 id. 470; *Bank* v. *Butler*, 133 id. 564; *Hewlett* v. *Elmer*, 103 id. 156.) Aside from the question of practice raised in the last point, the findings of fact by the surrogate having been affirmed by the General Term of the Supreme Court are not open for review on this appeal. (*Hewlett* v. *Elmer*, 103 N. Y. 156, 163.) The statute has provided how wills may be altered or revoked and an alteration not in accordance with the statute, if made after the execution, must be disregarded. (*Lovell* v. *Quitman*, 88 N. Y. 377.)

O'BRIEN, J. The will of Mary Snelling who died in the year 1890, was admitted to probate, after a contest before the surrogate, which was instituted by her nephews and nieces, her only next of kin, on the ground of incapacity and undue influence. She was about eighty-four years of age and possessed of a small personal estate which she bequeathed to the persons, husband and wife, with whom she lived at the time of the execution of the will which was but a few months before her death. The property came to her from her husband who died in 1885. Subsequent to his death she lived with various persons in the neighborhood as a boarder and during this time it appears that she made

several other wills in favor of parties with whom she lived or boarded for short periods of time.  Her management of the property and the frequent change of purpose on her part in disposing of it by will, from time to time, in favor of different persons with whom she temporarily resided, and to whom she was more or less attached, for the time, would seem to indicate that she had no fixed plan with reference to her estate and possessed no great intelligence in business affairs.  Still it was not shown conclusively that she lacked the capacity necessary in a person of her age and condition in life to dispose of her property by will or that the will in question was the result of undue influence.  The fact that the deceased was a woman of advanced age somewhat enfeebled in body and mind and that she gave her property to strangers, instead of her collateral relatives, from motives of gratitude or personal attachment does not show that she was wanting in intelligence sufficient to comprehend the condition of her property and the scope and effect of the testamentary provisions.  So long as her mental powers enabled her to understand and appreciate the amount and condition of her property and to comprehend the nature and consequences of her act in executing the will she was at liberty to dispose of her own in such manner as seemed best to her providing the disposition was her own free act.  What the law terms undue influence is not established by proof tending to show that the testator acted from motives of affection or gratitude though the objects of her bounty were strangers to her blood.  The influence or moral coercion, or by whatever other term designated, must be such as to overpower the will of the testator and subject it to the will and control of another in which case it assumes the character of fraud.  (*Horn* v. *Pullman*, 72 N. Y. 276; *Clapp* v. *Fullerton*, 34 id. 190; *Hollis* v. *Drew Theological Seminary*, 95 id. 166; *Marx* v. *McGlynn*, 88 N. Y. 370.)

The evidence given upon the trial before the surrogate, viewed in the most favorable light for the contestants, was conflicting, and the findings that the deceased was possessed of sufficient

capacity to make a will, and that the will was not the result of undue influence, are conclusive upon us with respect to the objections made against its probate. But the record discloses certain rulings by the surrogate in the course of the proceedings before him which, in view of the nature of the questions involved in the trial, cannot be overlooked. On the hearing, two witnesses were produced by the contestants for the purpose of sustaining the objections made to the probate of the will, who testified at great length, to various acts, conversations and transactions of the testatrix, tending to establish undue influence and incapacity. This testimony extended over some years prior to the execution of the will, and much of it had no bearing upon the issues, as may well be inferred from the fact that it covers over fifty printed pages in the record. The proponents then called two physicians, who both testified that they had read the whole of the testimony of the two witnesses referred to above, giving the names of these witnesses, and to each of them in succession the following question was propounded : " Assuming their testimony to be true, and basing your opinion upon such testimony, what would you say as to the mental condition of Mary Snelling, say in June, 1890 ? " This question was objected to by the counsel for the contestants ; and while the form in which the objection was made is quite inartistic, there can be no doubt as to what was intended, and we think was sufficient to challenge the competency of the testimony sought to be elicited. The surrogate overruled the objection, and an exception was taken. The witness in each case then answered : " I should say she was perfectly sane." It is needless to enter upon any reasoning or discussion to show that this question was improper, as this court has more than once condemned this method of eliciting opinions from experts. (*Reynolds* v. *Robinson*, 64 N. Y. 589, 595 ; *People* v. *McElvaine*, 121 id. 250 ; *Link* v. *Sheldon*, 136 N.Y. 1.) And it would be difficult to imagine a plainer breach of the rule than is presented by the question propounded to the witness in this case. The principle is not changed by the circumstance that all the testimony embraced

within the sweeping terms of the question was before the court, or by the fact that the mass of testimony upon which the opinion was based came from witnesses of the opposite party. The necessity of a specific question, at the time of the examination of the witnesses, covering all the facts, or assumed facts, upon which the opinion of the expert is required, is as apparent in such a case as in any other.

One of the subscribing witnesses to the execution of the will was a neighbor of the persons, husband and wife, in whose favor the will was made, and she attended at the time the will was executed, at the request of the wife, who was one of the beneficiaries under the will. About the time of the hearing upon the contest before the surrogate this subscribing witness was visited by a woman who, under an assumed name and without disclosing her real purpose, had been procured by the contestants or their counsel to elicit admissions from her for use upon the trial. The subscribing witness, after having testified to what took place at the execution of the will, and that the testatrix was at the time apparently rational, was subjected to a long cross-examination with reference to the interview with the visitor above referred to for the purpose of laying a foundation for impeaching her testimony. Many of the questions put to the witness in the course of this exceedingly prolix and discursive examination were properly excluded by the surrogate. She was asked, however, in substance, if Mrs. Cook, who was one of the beneficiaries under the will and interested in its probate, and who had procured her to attend as a witness to the will, had not promised her money or some reward in the case, and she answered the question in the negative. Subsequently the woman who sought the interview in the interest of the contestants, was called as an impeaching witness, and in various forms was asked if the subscribing witness had not so stated in the interview, and other questions tending to impeach her, which were excluded under exception. The interest which a witness has in the subject of the controversy is a material inquiry, as it bears upon the question of credibility, and where a witness has received, or has been

promised, any reward for giving testimony in a case, the fact may be shown upon cross-examination, and if denied, admissions or declarations out of court to that effect may be proved. The relations which the witness bears to the case are so far relevant to the issue as to admit proof of contradictory statements by way of impeachment when the proper foundation is laid. (1 Green. on Ev. § 450; *Newton* v. *Harris*, 6 N. Y. 345; *Stark* v. *People*, 5 Denio, 106.)

Many of the questions propounded to the impeaching witness were so framed that their purpose or meaning was not quite clear, or they were so intermingled with other matters that they were properly excluded, but with respect to the interest which the subscribing witness had in the establishment of the will, the contestants were not permitted to make such inquiry as they were entitled to. The very questionable methods used to procure the impeaching testimony might well affect its credibility with the surrogate, but could not affect its competency. An error in admitting or excluding evidence in such a case is not sufficient to reverse the decree of the surrogate, unless it appears that the party against whom the ruling was made was necessarily prejudiced thereby. (Code, § 2545.)

The rulings referred to related to important testimony in the case, and, at least in some degree, must have been prejudicial to the contestants. For these reasons, the judgment of the General Term and the decree of the surrogate should be reversed and a new trial granted, costs to abide the event.

All concur.

Judgment reversed.