BRIGGS v. GOERKE. (Supreme Court, Appellate Division, Second Department. June 7, 1898.) Action by James T. Briggs, as administrator of James H. Briggs, deceased, against Mary L. Goerke. Henry A. Powell, for appellant. Oscar Frisbie, for respondent. PER CURIAM. Judgment affirmed, without costs, and without prejudice to any action appellant may bring to recover the value of her services.

WOODWARD, J. (dissenting). James H. Briggs, prior to the 1st of January, 1892, was engaged in business in the city of Brooklyn, as a dealer in newspapers, magazines, etc. He had a son, James T. Briggs, the plaintiff in this action, and a daughter, Mary L. Goerke, the defendant. It appears from the evidence that the plaintiff was somewhat given to drink, and that he was disposed to spend the money which is father had accumulated as opportunity afforded. In the latter part of the year 1891, James H. Briggs was taken ill, or entered into a period of decline, owing to advancing years. Up to that time, and since the death of his wife, which occurred some time previous, the old gentleman had lived in the rear of the building which he occupied as a store; and the evidence indicates that he was living in a condition of filth and squalor, the young man living with him. On the development of his illness, the old gentleman, by common consent, was taken into the family of the defendant, where he remained up to the time of his death. The old gentleman had accumulated a sum of money aggregating something over $3,000, which was originally represented by a certificate of deposit and a bank book. After going to the home of the defendant, he signed these papers, and delivered them into the hands of the husband of the defendant, directing him to draw the money, and to return it to him. This was done. The money was placed in the hands of the old gentleman, who placed it in a box with some other valuables, and gave the same into the keeping of the defendant. After he had been in the family of the defendant for some three or four weeks, his health in the meantime continuing to fail, James H. Briggs sent for an attorney, and explained to him that he desired to have his property go to the defendant, but that he desired to have it in his control during his life. He was advised to make a will, but he objected to this, on the grounds that it was liable to lead to litigation, and that his son would contest the same. It was finally arranged that the old gentleman should enter into a contract with his daughter, the defendant, who should be given the money in consideration of affording him a home, medical treatment, and a re-

spectable burial when he should die. With this understanding, the attorney went to his office, and drew the contract, returning a few days later, and filling in the amount which the old gentleman concluded to give to the defendant. As thus completed, the instrument was duly signed in duplicate, each party taking a copy. Some three months later, the old gentleman died; and the son began a series of proceedings to get possession of some part of the money which had been thus disposed of, and the present action is the last in the series. The contract was signed in the presence of several persons, and was witnessed by the attorney, of whom the trial court says, "I do not doubt the sincerity and good faith of the attorney who prepared the contract." The trial court, by a process of reasoning which it is difficult for us to understand, reaches the conclusion that, "After a careful consideration of the whole case, I do not think a court of equity should permit the contract to be enforced." The court declares that "the father was helpless, and absolutely under the control of the defendant, his daughter"; but a careful reading of the evidence discloses, we think, no grounds for this conclusion. There is no evidence to show control on the part of the defendant, and absolutely no conduct other than might be reasonably expected from a daughter in the discharge of her duty to an aged and enfeebled parent. The court continues: "After the father went to live with his daughter, the son never saw him except in the presence of his sister, the defendant;" but there is no evidence in the case that the son ever sought to see him alone, or that there was any effort to prevent such a meeting. The whole evidence upon this question is that given by the plaintiff; and that it is not disputed is readily accounted for by the fact that, under the provisions of section 829 of the Code of Civil Procedure, the defendant, the only person competent to make such denial, is not permitted to become a witness. Again, the court says: "The sister took immediate charge of the father's property; took it out of the trust company, and converted it into cash;" but the evidence upon this point is that the money was taken out of the trust company upon the personal order of the deceased, and that he gave it into the custody of his daughter. Continuing, the court says: "I think, under all the circumstances, the burden was imposed upon the defendant to show the fairness and good faith in the contract under which she claims the father's property, and in this, it seems to me, she has failed. Undue influence must be inferred from all the circumstances of the case." The court then directs judgment in accordance with its findings. The key to this judgment of the court is found in the opinion, in which it is stated that Justice Field in a somewhat similar case held "that whenever there is weakness of mind in a person executing a transfer of property, arising from age or sickness, though not amounting to absolute disqualification, and the consideration is grossly inadequate, a court of equity will interfere and set the contract aside." While the court does not state where this opinion is to be found, we find substantially the language quoted in the case of Allore v. Jewell, 94 U. S. 506, the court speaking through Mr. Justice Field,

and we cannot concur with the trial court in the conclusion . that it justifies the judgment. The case under discussion by Mr. Justice Field was that of an aged woman who had for a series of years been considered as of unsound mind, who, during a fit of sickness, was called upon by the defendant, his agent, and an attorney, and induced to sign an agreement, whereby, for a grossly inadequate consideration, she transferred a valuable piece of real estate. The court say: "The deceased was at that time between sixty and seventy years of age, and was confined to her house by sickness, from which she never recovered. She lived alone, in a state of great degradation, and was without regular attendance in her sickness. There were no persons present with her at the execution of the conveyance, except the defendant, his agent, and his attorney. * * * The testimony of her attending physician leads to the conclusion that her mental infirmities were aggravated by it [her illness]. He states that he had studied her disease, and for many years had considered her partially insane, and that, in his opinion, she was not competent in November, 1863, during her last sickness, to understand a document like the instrument executed." It also appeared that the attending physician had communicated this information to one Dolsen, the agent of the defendant, and that Dolsen was the one who undertook to carry on the negotiation which resulted in the transfer, and that the deceased was unable to understand the English language perfectly, and that Dolsen undertook to explain to her the language of the contract in French. After reciting these and other facts, the court comments as follows: "In view of the circumstances stated, we are not satisfied that the deceased was, at the time she executed the conveyance, capable of comprehending fully the nature and effect of the transaction. She was in a state of physical prostration, and from that cause, and her previous infirmities, aggravated by her sickness, her intellect was greatly enfeebled; and, if not disqualified, she was unfitted to attend to business of such importance as the disposition of her entire property, and the securing of an annuity for life. Certain it is that, in negotiating for the disposition of the property, she stood, in her sickness and infirmities, on no terms of equality with the defendant, who, with his attorney and agent, met her alone in her hovel, to obtain the conveyance." It was in connection with this state of facts that the court used the language quoted by the trial court in the case at bar; and it will be seen that the facts are so entirely different that the opinion can have no bearing upon the present case. As was said in Re Martin, 98 N. Y. 193: "Here there is no proof of influence exerted or existing. None is pointed out by the appellant. The will is rational on its face. The property of the decedent was in real estate. It is distributed among her sons, subject to payment by them to each grandchild of fifty dollars. In the absence of evidence, however, the appellant relies upon the fact that the proponent of the will was the son of the testatrix; that he communicated to the scrivener the provisions to be inserted in the will, and became himself a beneficiary. Under different circumstances, these things might be important; but in the presence of a capable and intelligent testatrix,—of proof that the instrument offered for probate expresse[s] intentions in language dictated or adopted b[y] her,—they are of no moment. Something mor[e] must be shown than the relation of parent an[d] child and an opportunity for unfair dealing There must be evidence that the parent was in[?] posed upon or overcome by the practices of th[e] child to the benefit of the latter, before the bur[?] den of proof can be shifted." "So long as he[r] mental powers enabled her to understand and ap preciate the amount and condition of her prop erty, and to comprehend the nature and conse quences of her act in executing the will," sa[ys] the court in Re Snelling, 136 N. Y. 515, 32 N E. 1006, "she was at liberty to dispose of he[r] own in such manner as seemed best to her pro viding the disposition was her own free act What the law terms 'undue influence' is not es tablished by proof tending to show that the tes tator acted from motives of affection or grati tude, though the objects of her bounty wer[e] strangers to her blood. The influence or moral coercion, or by whatever other term designated, must be such as to overpower the will of the testator, and subject it to the will and control of another, in which case it assumes the character of fraud."

There was absolutely no evidence in this case showing that the defendant exercised any influence over the mind or acts of the deceased, and there was no conduct other than might have been reasonably expected from a daughter towards her aged and invalid father. In short, we can see no evidence in this case which entitles the plaintiff to any standing in a court of equity. The defendant took her father out of his wretchedness into which he had been allowed to drift by the plaintiff, and, after providing him a home and comfortable surroundings for a period of three months or more, she, upon the motion of the deceased, for and in consideration of $3,000, entered into a contract agreeing to furnish a home, with suitable medical attendance, and a decent burial when he should have concluded this life. He was 77 years of age, but he was liable to live for a number of years, and to require medical attendance during all of that time. No other child of the deceased, so far as appears from the evidence, had equal equitable rights to his property; and, in the absence of some evidence tending to show that his acts were unduly influenced by the defendant, the plaintiff cannot recover. There is no such evidence in the case. The judgment of the special term is reversed, and a new trial granted; costs to abide the event.