(41 App. Div. 153.)

## In re MURPHY'S WILL.

(Supreme Court, Appellate Division, Fourth Department. May 24, 1899.)

1. WILLS—TESTAMENTARY CAPACITY.

    A will will not be set aside on the ground of mental incapacity where it appears from the evidence that testator had sufficient intelligence to appreciate the amount and nature of her property, and who were the natural objects of her bounty, and to understand the provisions of the will disposing of it, though she may have been aged, illiterate, unrefined, and eccentric.

2. SAME—UNDUE INFLUENCE.

    In an action to set aside a will on the ground of undue influence, evidence that the residuary legatee of testatrix bore no blood relation to her, but that she had cared for testatrix in sickness, and been kind to her; that she made the arrangement with the attorney who drew the will, that she was present when it was drawn and executed; that the will was drafted by a respectable attorney; and that testator was clear and positive in expressing her wishes as to the disposition of her property,—is not sufficient to show undue influence in the execution of a will which gave $500 to each of two grandchildren of her only living sister, set aside $200 for her own funeral expenses and a monument, and gave the residue of a

$4,300 estate to one not a blood relation, subject to the payment of $200 for the burial expenses of her sister if she did not leave means of her own, to the exclusion of the sister who had received $2,000 from the estate of another sister.

Appeal from surrogate's court, Monroe county.

Appeal from decree revoking the probate of the will of Julia Murphy, deceased, and the letters testamentary issued thereon, and adjudging said will to be invalid, on the ground of mental incapacity and undue influence. Reversed.

The will was executed September 14, 1897. Decedent died July 14, 1898: The will was admitted as a will of personal estate July 18, 1898, the next of kin waiving the issuance of citation, and assenting to the making and entry of the decree of probate proceedings. The next of kin subsequently applied for a revocation thereof. A trial was had, and on the 20th day of January, 1899, a decree of the surrogate's court was entered, revoking the same, and annulling the letters testamentary issued upon the admission of the will. The testatrix was an unmarried woman, upwards of 70 years of age, and her sister was her only next of kin. By her will she bequeathed $500 each to two grandchildren of this sister, $200 for her burial expenses and a monument, $100 "for masses for the repose of her soul," and all the residue to Mrs. Rosa F. King, subject to the payment of $200 for the burial expenses of her said sister in case the latter did not leave means adequate for that purpose. The residuary legatee was also named as sole executrix. The amount of property left by Miss Murphy was $4,300.54, all cash.

Argued before HARDIN, P. J., and ADAMS, McLENNAN, and SPRING, JJ.

John Van Voorhis, for appellant King.
William F. Shaffer, appellant special guardian.
Richard E. White, for respondent.

SPRING, J. The testatrix was an old lady, but, except for a lameness, caused by an accident, was in good physical strength until long after the execution of the will revoked. She was born in Ireland, was illiterate, was thrifty and penurious, and in the management of her property up to the time of her death there was no abatement of this economy and good judgment. She was eccentric, of violent temper, slatternly in her household duties and in her dress; but these peculiarities existed in her life as far back as the witnesses go. The facts narrated warrant no finding of mental unsoundness adequate to overturn her will. Mr. Husbands, the secretary of the Rochester Savings Bank, testified he had been the administrator of the estate of Miss Murphy's sister, Margaret, and in the conduct of the estate he became acquainted with the decedent; that upon a settlement of his account he had deposited the funds in the Monroe County Savings Bank for the distributees, and that as testatrix, six months after, came with Mrs. Clark, another sister, to withdraw the money, they were told they must be identified, and Mr. Husbands was called in for that purpose. What identification signified was Greek to these ignorant old women, little used to the routine of banks. The circumstance which undoubtedly startled them was that upon presentation of their checks they could not immediately get their money. They evinced their excitement and displeasure in loud, boisterous

talk; but, when Mr. Husbands explained the situation, they calmed down. The banker, however, says these acts were, to his mind, irrational. They might have been, had she been, in her past life a methodical woman and way-wise to business; but the fright was to be expected of women in their sphere of life, and ebullitions of temper were usual with them. Other witnesses testify that the old lady was pestered by the street gamins, who rejoiced in exasperating her; that she chased them, swore at them, and threw stones at them. These acts show lack of refinement, but she was not a cultured woman. One of the witnesses—a notary —went with an attorney to take her acknowledgment to a waiver of a citation, and the old lady asked the attorney if he had brought her a husband; but she seems to have executed and acknowledged the execution of the papers presented, and the gentlemen evidently regarded her as in the possession of sufficient mental strength to do these acts satisfactorily to them. She drove callers and boys delivering groceries and other articles from the house; she was uncivil and profane in her speech; she often talked and muttered to herself, and, in her old-country fashion, kept her chickens in the house, and on one or two occasions was intoxicated. These and other similar acts were detailed by the witnesses, indicating she was violent and intemperate in speech and conduct; but she was not an imbecile, and there was no lack of testamentary capacity justifying the revocation of her will. Assuming all the stories recounted in opposition to her will were true, they amount to no more than idiosyncrasies of disposition, in no way reflecting upon her ability to manage her property and to make a proper will. Dr. Benford, her physician for years, and other acquaintances, are explicit in their statement of acts showing she was in full possession of her faculties. There is no evidence even tending to show she did not husband and guard her property well; that she did not understand its management in her latter life as well as at any time.

The law of wills is made for all classes of people, and those in every condition of life. A person of limited education, who, by dint of close saving, has acquired a small property, should, of all people, be unrestrained in his right to dispose by will of his little accumulations. Perversities of temperament, quirks in daily life, and even the enfeeblement of old age, are not to be invoked to overthrow the will of a testator. Courts properly scrutinize very carefully any endeavor to interfere with the right of disposition by will. The test in considering the mental fitness of a person executing a will is, did she appreciate the amount and condition of her property, and the claims of those who were the objects of her bounty, and understand the provisions by which her property is to pass? In re Snelling, 136 N. Y. 515, 32 N. E. 1006; Horn v. Pullman, 72 N. Y. 269; In re Folts' Will, 71 Hun, 492, 24 N. Y. Supp. 1052. There is nothing in the life of this shrewd, rugged, old woman, with her parsimonious clinging to her property, and with her whims and filth, which, under this standard, fails to show full testamentary capacity.

2. The proof· as to the exercise of undue influence rests wholly upon inference. The chief beneficiary, Mrs. King, had long been a friend of testatrix. She had cared for her in sickness, and evidently was closer to her than any of her own kindred, except the sister, Ellen. The latter had one son, a profligate, with whom Miss Murphy was not on friendly terms, and the widowed sister had been the recipient of $2,000 upon the death of their sister Margaret. Mrs. King made the engagement with the attorney who prepared the will, and was present at the time it was drawn and executed, and these are the only circumstances upon which a suggestion of impropriety can be hinged. The will was prepared by a respectable lawyer. Great care was exercised in its drawing, and the subscribing witnesses are not only explicit in testifying she possessed testamentary capacity, but their narration of the transaction shows the old lady was clear and positive in her wishes as to the disposition of her property. Undue influence must be · established affirmatively by circumstances, by acts, and in such a way that the court can see clearly that the will of another has overborne that of a testator. Mere opportunity will not suffice. Thomas, Estates by Will, p. 1191 et seq.; Cudney v. Cudney, 68 N. Y. 148; In re Shannon's Will, 11 App. ·Div. 581, 42 N. Y. Supp. 670; In re Snelling, 136 N. Y. 515, 32 N. E. 1006, supra; In re Rohe's Will, 22 Misc. Rep. 415, 50 N. Y. Supp. 392. The will itself is not radically unjust. The grandchildren of the sister are given $1,000, and Mrs. King is the residuary legatee. She was a stranger in blood, but had been sympathetic and thoughtful of this old woman, who, evidently, had few friends; none to whom she was under special obligations. We cannot say, because she recognized the claims of gratitude and affection as superior to those of her sister, her desires are to be annulled. The secret motives prompting a person to make a will in a certain way may be difficult to ascertain, but they belong to the testator; and, whether right or wrong, his production must be respected. This was testatrix's property. She was disposing of it, and her wishes are supreme.

The decree revoking the will is reversed, with costs ·of the executrix appellant against the respondent personally, and the costs of the appealing infants to be paid out of the estate. All concur.

<hr />