Where testator, aged 60 years, and separated from his wife and married daughter,—being a man of strong mind, and conducting his business affairs until a month before his death,—made a will during his last illness, and about three months before his death, giving his grandniece all his estate, amounting to $6,400, as compensation to her for nursing him, it will not be set aside on the ground of undue influence.

2. SAME.

     Statements of testator before the making of his will, and long before his death, that he intended to give his property to his grandniece, that his relatives did not care for him, and that he did not intend to leave them anything, are admissible to show that a will in favor of such grandniece was not the result of undue influence.

In the matter of the probate of the last will of James E. Munger, deceased. Probate granted.

E. M. Doughty and R. W. Doughty, for proponents.
Thomas Watts, for contestant.

HOYSRADT, S. The instrument offered for probate was executed by James E. Munger on November 12, 1901. He died February 12, 1902, at Fishkill Landing, after a long illness of consumption. The evidence shows that the disease assumed a most serious form in September, 1901, and progressed gradually until death ensued. The testator left surviving a widow, with whom he had not lived for 16 years, and a married daughter, with whom he had corresponded at intervals, both of whom resided at Middletown, Orange county, N. Y. The will gives the testator's property, estimated to be worth $6,400, to his grandniece, Eva Gertrude Linson Moore, "for the reason that I wish to show in the best way I possibly can my appreciation of her faithful care for and unselfish interest in me for a long time past. I feel that I cannot even in this way recompense her sufficiently for what she has done for me." Probate has been opposed by Ella F. Marshall, the testator's daughter, and an effort has been made to show the testator's lack of testamentary capacity, and the existence of undue influence alleged to have been exerted previous to and at the execution of the instrument. Although the contestant's case rests mainly upon innuendo and inference, it presents such an equitable side that it commands a careful review of the case, to determine whether the diversion

of all interest in the estate from one of the objects of the testator's benefaction—his only child—was the result of improper influence or insufficient capacity.

The testator was about 60 years of age in 1901. He had been supervisor of the town of Fishkill for eight years, and postmaster of Fishkill on the Hudson for one year. He also conducted a lumber and building business for many years, and, notwithstanding that he was in the incipient stages of consumption from 1899, he led an active life in business, politics, and the enjoyment of society of numerous friends, down to the summer of 1901. From the early part of September, 1901, until his death, he was practically confined to his room in the Holland Hotel, Fishkill Landing, where he was visited daily by many friends and relatives, both before and after the execution of his will. The beneficiary, his grandniece, who was then about 26 years of age, was his nurse, and evidently the most favored of all his relatives. He attempted no secret of his regard for her and appreciation of her services, and his freely expressed intention of leaving her his estate to the exclusion of his wife and daughter is, in my judgment, the strongest support of the will, which faithfully reflects those intentions. Two years ago he stated to Charles Munger, a cousin, that he intended to give his property to Gertrude, as his relatives did not care for him, and he did not propose to give them anything. In August, 1901, he said to a friend that Mrs. Moore had been kind to him, and he thought a good deal of her, and he intended she should have all he had to give. She was not with him at this time. The testator also stated to Mrs. Gordon, wife of the proprietor of the Holland Hotel, before he had made the will, and before Mrs. Moore had come to take care of him in his last illness, that what he had should go to Mrs. Moore. He also said he did not wish to see his wife or daughter, and they made no effort to see him for a long period previous to his death, although living within 25 miles, and the contestant was at Fishkill Landing shortly before he died. There is no evidence of any delusion or irrational act on the part of the testator, but, on the contrary, the evidence is abundant that he was a man of strong mind and of clearest perception and intellect, which is a condition usually present with consumptives. He directed his business affairs from his bedside, when physically unable to attend to them, down to January 1, 1902. The will was drawn from his personal instructions, and the witnesses to the will say that the execution was entirely voluntary and unrestrained. There is no evidence of importunity, coercion, or any facts or circumstances that show that the testator ever contemplated any other disposition of his property, or that his will power was either affected or overcome by influence, or was at all susceptible to it. While the testator occasionally wrote to his daughter, it is quite apparent that they were not on terms of intimacy, and that the testator had fully determined that neither his wife nor daughter, with whom the relationship of husband and father existed only in name, should receive any portion of his estate; and he so expressed himself with great freedom when unsurrounded by any of the influences alleged to have been present on other occasions. There is

no proof of any act on his part indicating that any importunity was being made, or that he was laboring under any false impression as to his duty. This will is the result of his desire to compensate his grandniece for her services through his illness. It was his privilege to estimate the value of those services, without regard to the adequacy of the consideration. Speculation as to the nature of their relations can lead to no solution which would affect the case from a legal standpoint.

There is not sufficient evidence to sustain a finding of the testator's incapacity. The only direct proof on the subject is as to his weak physical condition. He was unquestionably enfeebled physically at the time of making his will, and for months previously, but no inference of testamentary incapacity can be drawn from that. In re Drake's Will, 45 App. Div. 206, 60 N. Y. Supp. 1020, and numerous cases there cited.

In the case of Dovie v. Armstrong, 160 N. Y. 584, 55 N. E. 302, the testator gave the bulk of his property to a college, and made no provision for his son, who was his only child. The court of appeals decided that the burden was upon the son to adduce evidence which would be sufficient to uphold a verdict that the testator was the victim of such a delusion with respect to his son as to prevent his affections from operating in their natural channels, and where there is a failure of proof of a delusion in his domestic relations, but the proof is abundant that they were sufficiently unfortunate and unhappy, whether attributable to his behavior or not, to embitter him and harden his affections against his son, a verdict sustaining the will was properly directed by the court. The presumption of validity of a will is not affected by failure to provide for a son, nor overcome by showing that the testator was of advanced age; and testamentary disposition of property is not invalidated because its provisions are unequal or unjust, or the result of passion or of other unworthy or unjustifiable sentiments. Horn v. Pullman, 72 N. Y. 269. Many other authorities might be cited to sustain a finding of the testator's capacity from the evidence presented, among which are In re Iredale's Will, 53 App. Div. 45, 65 N. Y. Supp. 533; In re White, 121 N. Y. 406, 24 N. E. 935.

It has been proven that the beneficiary stated after the execution of the will that she was going to have one of the executors removed. The will was not subsequently changed, and this remark, while having no direct bearing on the question of influence, is the only inkling of it in the case. Beyond it nothing but inference exists. That circumstance would avail nothing, when the well-established principles as to what constitutes undue influence are considered. The contestant must not only show the opportunity to exercise undue influence, but that it was actually exerted, and that it overpowered the will of the testator. Opportunity and motive do not justify an inference of undue influence. In re Gihon's Will, 44 App. Div. 621, 60 N. Y. Supp. 65; In re Keefe's Will, 47 App. Div. 214, 62 N. Y. Supp. 124; In re Westerman's Will, 29 Misc. Rep. 409, 61 N. Y. Supp. 1065; In re Mondorf's Will, 110 N. Y. 450, 18 N. E. 256. Influence, to be undue, must be irresistible, and must

have been exercised by coercion, imposition, or fraud, which must be proved. In re Read's Will, 17 Misc. Rep. 195, 40 N. Y. Supp. 974. It must be shown that the influence was sufficient to destroy free agency, and that testator was constrained to do something which was against his free will and desire. In re McGraw's Will, 9 App. Div. 372, 41 N. Y. Supp. 481. And it must be such as to suppress the independent volition of the testator. In re Blair, 16 Daly, 540. Undue influence must be established affirmatively by circumstances and acts, and in such a way that the court can clearly see that the will of another has overcome that of the testator. In re Murphy's Will, 41 App. Div. 153, 58 N. Y. Supp. 450; In re Snelling, 136 N. Y. 515, 32 N. E. 1006. The contestant certainly has not borne the burden of proving incapacity and undue influence, within the requirements of any of the numerous authorities. The application for probate is granted.

Probate granted.

---

(38 Misc. Rep. 272.)

### In re BENEVENTANO'S WILL.

#### (Surrogate's Court, Kings County. June, 1902.)

1. WILL—SUBSCRIPTION BY TESTATOR.
    The will of an illiterate person will not be admitted to probate where he has not subscribed it by a mark or symbol.
2. SAME—EVIDENCE.
    A New York notary wrote an instrument in Italian disposing of property. The notary spoke English so imperfectly as to require an interpreter. The will contained a clause stating that it was not subscribed by the testator, "because he has stated that he is illiterate," and a further clause that it was read to him and signed by the witnesses and the notary, which would have rendered the will valid in Italy as the will of an illiterate. After the word "illiterate" was a check mark, such as is used sometimes to indicate that a document is correct, and it was stated by the notary to be made by the party to signify that he was in fact illiterate. ꞮHeldꞮ, that the paper was not so executed as to be entitled to probate as a will.