(68 Misc. Rep. 581.)

## In re HALL'S ESTATE.

(Surrogate's Court, Cattaraugus County. August, 1910.)

WILLS (§ 166*)—UNDUE INFLUENCE—EVIDENCE.

Testator by his will gave his wife the use of the estate, consisting of a house and lot, for life, with remainder to a son by a former wife; he being a middle-aged man and able to provide for himself. On the same day, as the result of persuasion of his wife, who was in poor health, he made a new will, giving his estate to her absolutely. *Held* insufficient to show undue influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

In the matter of the estate of Henry N. Hall, deceased. Decree admitting will to probate.

M. V. Benson and G. W. Cole, for proponent.

Crowley & Conley, for contestant.

DAVIE, S. Upon the return of the citation issued for the probate of the will of the decedent, Harry Hall, his son, filed objections, alleging lack of testamentary capacity on decedent's part at the time of the execution of the will, and that the execution of the same was procured by undue influence.

Decedent died on the 26th day of March, 1910, leaving him surviving one son, his only heir at law and next of kin, who is the contestant, and his widow, who was a second wife, and not the mother of Harry Hall. The will bears date on the 27th day of August, 1907, and names the widow as the sole legatee and devisee and executrix. The only estate possessed by the decedent at the time of his decease was a house and lot, where he resided, in the village of East Randolph, of the value of $1,200. At the time of and for several years preceding decedent's death, his family consisted of himself and wife. The son Harry was engaged in business for himself, but occasionally visited his father. No enmity or ill will on the part of decedent toward his son is disclosed by the evidence. Decedent was somewhat advanced in years, to some extent physically debilitated, but possessing fair business intelligence. The widow had formerly resided in the family of decedent's father, doing work as a domestic, and finally married decedent, with whom she resided for many years, so far as the testimony discloses, in harmony and without serious discord or disagreement.

In the forenoon of the 27th of August, 1907, the same day upon which this will was executed, decedent and his son went to the law office of Goodwill & Benson in East Randolph, and decedent stated to one of the attorneys that he desired to have his will prepared; that he wished to give his wife the use of all his property during her lifetime, and, upon her death, to the son. A will was thereupon prepared in accordance with decedent's instruction, signed by him, and published and declared by him as his last will, and in all respects fully executed in accordance with the statute. It does not appear that the son took any part in the transaction relating to the execution of the

will, or made any suggestion as to any of its provisions. A copy of the will was prepared and delivered to the son, and thereupon decedent and the son left the office together. In the afternoon of the same day, decedent and his wife again went to the same attorney's office, and the details of what then occurred are fully described by the attesting witness Carpenter. He says:

"He and his wife came in after dinner. In the forenoon he and his son had come to the office and stated to Mr. Benson that he wanted to make his will, and the will was made under his direction by Mr. Benson, and executed, and I was one of the witnesses to that will. I don't think three hours after that he came to the office again. That was the occasion in the afternoon when this will was executed, and his wife was with him; and, as I remember it, Mrs. Hall was crying when they came in the office; and, as I remember it, there was quite a conversation between Mrs. Hall, Mr. Goodwill, and Mr. Hall. The substance of the conversation was: Mrs. Hall was talking with Mr. Hall, endeavoring to get him to make another will. Mr. Hall said he had already made a will, and she says, 'Yes, but you don't give me in that will what you had ought to give me;' and I know in all this conversation directed to Mr. Hall it would be quite a while before he would answer, and would have to have the question put to him two or three times; and I remember of her saying she couldn't take care of him and have the property go to some one else; and I remember of his saying to her that he had provided for her in the will he had drawn in the morning; and I remember of her saying, 'It was just for as long as I lived.' She asked him if he didn't want to do it, and she asked him again; and I think during the greater part of the conversation she was crying, and she appeared very nervous; and I remember of Mr. Goodwill asking if he wanted to give it to her absolutely, and of his saying he had made his will, and of her saying to him she couldn't take care of him and not get anything for it. Q. What was done with the former will? A. It was burned. Q. Who burned it? A. Mr. Goodwill. Q. At whose direction? A. At the direction of Mr. Hall. They were in the office an hour and a half before the will was made, and I remember they had to put a good many questions to him to get him to direct Mr. Goodwill to destroy the will. Mr. Goodwill asked him a good many times if that was his request; and finally he directed Mr. Goodwill to destroy it, and Mr. Goodwill burned it there in the presence of all of us."

After the will in question was prepared, it was read over to the decedent, signed by him, duly declared and published by the decedent as his last will and testament, and thereupon signed by the attesting witnesses in the presence and at the request of the decedent. It appears from the evidence presented on behalf of the contestant that the widow was unfriendly to him, and that she had asserted that she hated him, and that he should not have any of the property. The only testimony offered by the proponent was that of the attesting witnesses, showing a strict compliance with the statutory requirements in the execution of the will in question, and proof of the further significant fact that, on the 25th day of February, 1906, the decedent had duly executed a will containing precisely the same testamentary provisions as the will propounded; that is, all of decedent's estate was given absolutely to the widow, and she was named as the executrix thereof.

The evidence fails to establish the allegation of want of testamentary capacity on the part of decedent at the time of the execution of the two wills on the 27th day of August, 1907. While not vigorous, physically or mentally, he possessed sufficient mentality and under-

standing to distinctly recall and comprehend the nature and extent of his estate and the relative equities of those who were natural objects of his testamentary bounty. That is all that the law exacts as an indispensable qualification in testamentary transactions.

The more important consideration relates to the allegation of undue influence. It is urged on the part of the contestant that the destruction of the first will and the execution of the second, on the day named, working a somewhat radical change in the testamentary disposition of decedent's estate and entirely disinheriting the son, were the result of dominating importunity on the part of the widow, amounting to undue influence within the legal significance of that term. The subject of undue influence has so frequently received careful consideration in testamentary jurisprudence that no serious difficulty is encountered in discovering the true rule as an abstract proposition. The difficulty arises when we attempt to apply such rule to the facts and circumstances of some particular case.

Undue influence has been defined as:

"That which compels the testator to do that which is against his will, from fear, a desire of peace, or some feeling which he is unable to resist." Schouler Wills (2d Ed.) par. 22.

Influence which exists from attachment, affection, or a desire to gratify, or which results from argument and appeals to the reason and judgment of the testator, is not undue nor sufficient to invalidate a will. 27 Am. & Eng. Encyc. of Law, 453. Undue influence consists in exerting upon the testator such an improper influence, whether fraudulent, threatening, or otherwise coercive, as to effect a change in the testator's testamentary disposition, so that the will made is not the will he would have made if uninfluenced. Matter of Martin, 98 N. Y. 193; Matter of Vedder, 14 N. Y. St. Rep. 470; Matter of Bolles, 37 Misc. Rep. 562, 568, 75 N. Y. Supp. 1062.

Undue influence will not be presumed, but the party asserting it assumes the burden of proving its existence. Dobie v. Armstrong, 160 N. Y. 584, 55 N. E. 302; Matter of Nelson, 97 App. Div. 212, 89 N. Y. Supp. 865; Matter of Mondorf, 110 N. Y. 450, 18 N. E. 256. If there are testamentary capacity and knowledge on the part of the testator of the contents of the will, and the testamentary requirements of the statute are complied with in its execution, it can be avoided only by proof of influence amounting to force or coercion; and the burden is upon the party making the allegation of showing that testator was imposed upon or overcome by the act or practices of the beneficiary. Matter of Martin, supra; Matter of Mabie, 5 Misc. Rep. 179, 183, 24 N. Y. Supp. 855; Loder v. Whelpley, 111 N. Y. 239, 18 N. E. 874; Matter of Williams, 64 Hun, 636, 19 N. Y. Supp. 778.

In the case of absence of direct proof, the charge of undue influence must be established by such an array of circumstances as to make the inference of its exercise irresistible. The contestant must show facts utterly inconsistent with the hypothesis of the execution of the will by any other means than undue influence. Gardiner v. Gardiner, 34 N. Y. 155; Loder v. Whelpley, supra; Marx v. McGlynn, 88 N.

Y. 357; Matter of Murphy, 41 App. Div. 153, 58 N. Y. Supp. 450; Matter of Snelling, 136 N. Y. 515, 32 N. E. 1006; Matter of Lyddy's Will, 53 Hun, 629, 5 N. Y. Supp. 639.

In view of the fact that the testator's property was comparatively small in amount, consisting merely of the dwelling and lot where he resided, that the son was a man of middle age and entirely competent to care for himself, and that the widow was somewhat enfeebled in health and of advanced years, and, as it appears, hardly in a situation to be thrown upon her own resources for support and maintenance, it is not remarkable that she should have regarded the provisions made for her in the will executed in the forenoon as entirely inadequate and insufficient. Nor is it at all unnatural that the testator should have desired to remember his son, to some extent, in the ultimate distribution of the estate; but it seems, that, as early as 1906, testator had determined that, under all the circumstances, there was no more than sufficient of his estate to provide for his wife in her old age and he had accordingly executed his will giving everything to her. Just what line of reasoning led him to attempt some different testamentary disposition giving the son the greater interest therein is not disclosed.

There can be no doubt but that at the time of the execution of the first will, on the 27th day of August, 1910, testator desired and was of the opinion that he ought to provide for the son as well as his wife; nor can there be any doubt but that he was led to make the will now presented at the earnest solicitation of the wife, or that she reasoned with him regarding the insufficiency of the provision made for her in the first will of that date. Undoubtedly he was influenced to some extent by her assertion that she could not take care of him if the property was to go to some one else, and it was with a considerable degree of reluctance that he finally consented to make the change desired by her and to have the former will destroyed; but it is apparent that he did consent, that the will now presented was prepared and read to him, or that he fully comprehended its contents, or that he voluntarily signed the same, declared it to be his last will, and requested the attesting witnesses to sign as such. While it is unfortunate that the widow found it necessary to interfere to any extent to protect what she honestly believed to be her rights, yet there was nothing in her conduct amounting to undue influence within the meaning of the term as established by the cases cited.

A decree will be entered herein, dismissing the objections filed and admitting the will to probate.

Decreed accordingly.