(152 App. Div. 667.)

THOMPSON et al. v. PETERSON et al.

(Supreme Court, Appellate Division, Second Department.　October 4, 1912.)

1. WILLS (§ 163*)—ACTION TO SET ASIDE PROBATE—UNDUE INFLUENCE—BURDEN OF PROOF.

Plaintiffs, in an action to set aside probate of a will for undue influence in its execution, have the burden of proving such influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 388–402; Dec. Dig. § 163.*]

2. WILLS (§ 166*)—EXECUTION—UNDUE INFLUENCE—EVIDENCE.

Proof of undue influence in the execution of a will must be of a substantial nature. Mere conjecture or speculation, or the possibility, that it may have been used, is not enough.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

3. WILLS (§ 163*)—EXECUTION—UNDUE INFLUENCE—EVIDENCE.

That the beneficiaries of a will were not blood relatives of testator raises no presumption of undue influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 388–402; Dec. Dig. § 163.*]

4. TRIAL (§ 330*)—VERDICT—SEVERAL ISSUES.

The verdict must fall, where it cannot be said on which of two issues it was predicated, and there was error in the submission of one of them.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 777–781½; Dec. Dig. § 330.*]

5. EVIDENCE (§ 554*)—EXPERT TESTIMONY—EXCEPTIONS TO GENERAL RULE.

Experts are not confined to a statement of a general rule, but may state recognized exceptions thereto; so' the testimony for defendants in an action to avoid, on the ground of mental incapacity, a will executed shortly before testator's death, being that he was in fact, at such time, possessed of all his mental powers and of sound mind, an expert may testify that, notwithstanding the general rule to the contrary, one dying of the disease he did may be perfectly conscious and capable mentally up to a few minutes before his death.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2375; Dec. Dig. § 554.*]

6. WILLS (§ 432*)—ACTION TO SET ASIDE PROBATE—PROBATE AS EVIDENCE.

Under Code Civ. Proc. § 2653a, declaring that, in an action to set aside the probate of a will, the decree admitting it to probate shall be prima facie evidence of its due attestation, execution, and validity, and that the party sustaining the will shall be entitled to open and close, and that he shall offer the will and probate, and rest, and the other party shall then offer his evidence, and the party sustaining the will shall then offer his other evidence, the will and decree, unanswered, is sufficient to require a verdict sustaining it; so that, though the decree is not conclusive, after the opponents of the will have offered their evidence, instructing that the decree has no probative force, and is to have no weight as evidence on the inquiry of due attestation, execution, and validity of the will, is error.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 923; Dec. Dig. § 432.*]

Appeal from Trial Term, Queens County.

Action by Edward D. Thompson and others against Lillian T. Peterson and another, individually and as executrices, and another.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

From a judgment for plaintiffs, and an order denying a motion for a new trial, and also from an order granting taxable costs and disbursements and an extra allowance, defendants appeal. Reversed, and new trial granted.

Argued before HIRSCHBERG, BURR, CARR, WOODWARD, and RICH, JJ.

Timothy M. Griffing, of Riverhead, for appellants.

Lyman Ward, of New York City, for respondents.

WOODWARD, J. This action was brought, under the provisions of section 2653a of the Code of Civil Procedure, to set aside the probate of the last will and testament of Charles E. Thompson, deceased. The case was tried before the court and a jury, who rendered a verdict in the plaintiffs' favor. The defendants moved for a new trial, which was denied, and from the judgment entered on the verdict, and the order denying the new trial, an appeal is taken to this court.

The testator died at Jamaica, Queens county, on the 24th day of February, 1910. His wife had died a short time before him, on February 10, 1910. They left no children. By the will the testator gave a legacy of $2,000 to his brother William Thompson, another legacy of $2,000 to his brother Edwin Thompson, and then directed the residue of his estate to be divided equally between the defendants Charlotte E. Griffin, Jennie E. Cornell, and Lillian G. Peterson, who were nieces of his deceased wife.

The testator left an estate consisting of personal property, of the value of about $29,000, and a parcel of land, valued at about $1,500. At the time of his death he was 65 years of age. He was a native of Long Island, but for a considerable number of years prior to January, 1910, had resided at Albany, where he was employed as a clerk in the office of the State Department of Health. About December 1, 1909, he resigned his position, and early in January, 1910, went to St. Augustine, Fla., with his wife, who was in poor health at the time. Mr. Thompson was also in poor health, having suffered for some time from diabetes, and also from hardening of the arteries. Mrs. Thompson died rather suddenly at the boarding house where the couple were staying. The testator brought his wife's remains by steamer to New York, and had them buried at Springfield, Long Island, where her mother was buried. This interment was had after wiring Mr. George E. Cornell, the husband of his wife's niece, Jennie E. Cornell, at Jamaica, Long Island. After the funeral, the testator went to Mr. Peterson's residence in Jamaica, where he resided until his death, which occurred nine days later. A few days after the funeral of his wife, he met Mr. Leander B. Faber, who had acted as his attorney in other matters, and told him he was coming to see him. He was on the street on Monday, February 21st, but after retiring on February 22d he did not leave his room, nor was he out of bed to be dressed, although up and around the room.

On Tuesday morning, February 24th, at about 8:30, Mr. Faber was summoned to Mr. Peterson's house by a telephone message from Mrs. Peterson. On his arrival, he was told Mr. Thompson was up-

stairs and wished to see him. He went upstairs to Mr. Thompson's bedroom, and remained there about 5 or 10 minutes alone with Mr. Thompson, and at that time Mr. Thompson told him he wanted to have his will drawn, but he did not know what he wanted to do about his brother "Eddy." Mr. Faber told him to think it over, and when he had made up his mind to let him know, and he would come back. A few minutes before 10 he was again called on the telephone, and told Mr. Thompson wished to see him. He again went to Mr. Peterson's house, taking with him paper and a seal. On arriving at the house, he went to Mr. Thompson's room, and was there for 10 to 15 minutes. Mr. Thompson then told him what he wanted to do in his will; that he wanted to give his brother "Eddy" $2,000, his brother William $2,000, and wanted to give the rest to his wife's nieces. Mr. Faber then went downstairs into the dining room and wrote out the will on the paper he had brought, but before doing so telephoned to a Mr. Barthel, who was an attorney employed in his office, to come over and act as a witness to the will. Mr. Barthel arrived at about the time the writing of the will was finished. The two then went upstairs to the testator's room. Mr. Faber read to him the will he had prepared, and asked him if it was all right. He replied it was, and sat up in bed and signed the will, and, when asked if he declared it to be his last will and testament by Mr. Faber, answered, "Yes." Mr. Barthel and Mr. Faber were asked to witness the will, and they then and there signed it as such. No one was present at these transactions but the testator and Mr. Faber and Mr. Barthel. Mr. Faber testified no one made the slightest suggestion to him (Faber), or to Mr. Thompson, as to any feature of the will. After the will was executed, Mr. Thompson gave the will to Mr. Faber, who, at Mr. Thompson's request, took it to his office. Mr. Faber and Mr. Barthel both testify that, while a very sick man, the testator's mind was clear. Mr. Thompson died about four hours after the execution of the will.

The foregoing, we think, is a fair statement of the evidence in the case touching the circumstances attending the execution of the will. There is in the case the absence of any further or different evidence tending to show any undue influence on the part of the beneficiaries named in the will, or on the part of any other person. One of the grounds on which the validity of the will was attacked, as alleged in the complaint and claimed on the trial, was that its execution was procured by fraud and undue influence practiced on the testator by the defendants Lillian T. Peterson, Jennie E. Cornell, and other persons.

The trial court was requested at the close of the evidence to take from the jury any question as to undue influence in this case. The court refused, and the defendants excepted. On the contrary, the court instructed the jury that it was a question for them to determine from the evidence; and in our opinion the ruling of the trial court and the manner in which the question was submitted to the jury were highly prejudicial to the rights of the defendants. The court on that branch of the case, in its charge to the jury said:

"It is your function to draw legitimate inferences as to things that no witness speaks of, to draw legitimate inferences from other facts, which

are proven to your satisfaction. The fact that nobody has sworn to any particular thing, or to some particular thing, does not immediately require you to check that off as one of the facts that are not in the case. If you get up some morning and find a window in your house open and your money gone, and a man's track in the snow, coming and going underneath your window, you know that you have been robbed by a burglar, although you never saw him. That is the reasonable inference to draw, and where anything transpires behind closed doors. * * *

"Now, there is another thing, another consideration—whether he was brought to the desire, the intention, the purpose, to make this will by any undue influence. Now, I have pointed out to you that this thing all happened behind the doors of Mr. Peterson's house, and none of his heirs and next of kin, none of the persons who would have received this property if he had made no will, were present or knew that he was at the point of death, and nobody says he ever thought of making a will before, and the first any witness knows about it is when Mr. Faber gets the telephone message from Mrs. Peterson at 8 o'clock in the morning. Why at 8 o'clock in the morning? Was it Mrs. Peterson's idea that he should make the will, or was it his? Is there any evidence about it? None whatever. There is no evidence that he suggested to Mrs. Peterson that she send for Mr. Faber. When Mr. Faber got there, are you satisfied that he had heard anything about the will before, or that he had made any suggestion to anybody in reference to it? Mr. Faber did not sit down and consult with him about the will. He simply went away and left him. Later on Mrs. Peterson called him again, and then he went, furnished with paper and writing materials, and he says he took his instructions. We have not got the memoranda of the instructions, and I do not know that Mr. Faber told us what those instructions were, except that he said he drew the will in accordance with them. Now, Mrs. Cornell was in the house. Why was Mrs. Cornell in the house, coming and going, as they said, in and out of the room, where Mr. Faber was drawing the will? Why was she there? Well, of course, that is for you. It is a grain, a drop in the bucket, and is to be taken account of.

"When he came to make these two bequests to his brothers, did he get the names right? If he had written their names when he was in Florida, would he have written them the way he did, the way they were written in this will? That is a circumstance that you have a right to take into account. When it came to the execution of the will, did he choose his witnesses? Did he send for Mr. Faber's clerk? Not at all. He did not even request that he be sent for. One of the neighbors was not called in to witness the will. The whole matter rested within the knowledge of these two ladies, their husbands, the doctor, and the two lawyers. Now, was a man in his situation likely to adopt readily the suggestion of somebody else as to the disposition of his property? Did he take the initiative in anything when he executed the will? He just answered questions. Is there anything in that that enables you to judge as to the extent of the mentality that he had at that time? * * *

"No man or woman testified that anything was said to the testator; but I illustrated to you how you could infer sometimes things that you did not see. And when a thing has been brought about, and it cannot be accounted for in any other way, why you may make an inference that it was brought about that way."

[1] We can find no evidence in the record which justifies the submission of the question of undue influence to the jury. The burden of proving undue influence rested on the plaintiffs, and before they could succeed on that issue it was necessary for them to produce evidence on that point. Loder v. Whelpley, 111 N. Y. 239–250, 18 N. E. 874; Matter of Will of Smith, 95 N. Y. 516; Matter of McCarty, 141 App. Div. 816, 126 N. Y. Supp. 699; Scott v. Barker, 129 App. Div. 241, 243, 113 N. Y. Supp. 695.

[2] The proof should be of a substantial nature. Certainly the jury's verdict cannot be predicated upon mere conjecture and speculation. The possibility that undue influence may have been used cannot justify setting aside a will on that ground.

[3] The mere fact that the defendants were not related to the testator by blood raises no presumption that the bequests in their favor were the result of undue influence. Dobie v. Armstrong, 160 N. Y. 584, 55 N. E. 302; Heath v. Koch, 74 App. Div. 338, 77 N. Y. Supp. 513, affirmed 173 N. Y. 629, 66 N. E. 1110; Matter of Snelling, 136 N. Y. 515, 32 N. E. 1006. As was said in Cudney v. Cudney, 68 N. Y. 148:

"To invalidate a will on the ground of undue influence, there must be affirmative evidence of the facts from which such influence is to be inferred. It is not sufficient to show that a party benefited by a will had the motive and opportunity to exert such influence. There must be evidence that he did exert it, and so controlled the actions of the testator, either by importunities which he could not resist, or by deception, fraud, or other improper means, that the instrument is not really the will of the testator."

The record in this case utterly fails to suggest any such condition. On the contrary, the evidence for the defendants, which stands practically uncontradicted and unimpeached, tends to establish that the provisions of the testator's will were the product of his own free and voluntary act, uncontrolled by any influence or suggestion by or from the defendants.

We are unable to discover anything in the will itself strange or unnatural. His nearest blood relations were his brothers. His wife had just died. He was a sick and homeless old man. He entertained sentiments of affection for his nieces, who were his chief beneficiaries. When he brought his wife's remains home, he went to Mrs. Peterson's house, and asked the privilege of staying there. Under such circumstances it does not impress us as at all unnatural that the testator, from feelings of affection and gratitude, should desire to leave the bulk of his estate to his nieces by marriage.

"What the law terms undue influence is not established by proof tending to show that the testator acted from motives of affection or gratitude, though the objects of her bounty were strangers to her blood." Matter of Will of Snelling, 136 N. Y. 515, 32 N. E. 1006.

We therefore think the trial court erred in submitting to the jury the question of undue influence.

[4] It is true that the plaintiffs, in addition to the claim of undue influence, also charged that the testator did not possess testamentary capacity to make a will, and gave evidence in support of that contention, and it is possible that the jury may have predicated their verdict wholly upon the evidence of mental incapacity. Nevertheless, it is possible the verdict may have been predicated on the theory of undue influence. Under such circumstances, where one issue has been improperly submitted to a jury, the entire verdict must fall. Buchanan v. Belsey, 65 App. Div. 58, 72 N. Y. Supp. 601.

It is a fair question whether the verdict should not be set aside as against the weight of evidence on the issue as to the testamentary capacity of the testator. On that issue we are unable to say the verdict was wholly unsupported by the evidence, although there appears to be strong grounds for urging that the verdict was against the weight of evidence. We need not, however, pass upon this point, as we deem the submission of the question of undue influence to the jury absolutely fatal to the verdict and judgment entered thereon.

[5] There are numerous exceptions in the record to rulings of the trial court upon questions of the admission and exclusion of evidence which we may omit to here discuss. However, there is one ruling of the court in which we think the court was so clearly in error that we may here refer to it. Dr. Frank E. West was called by the defendants as an expert physician, to testify touching the mental and physical condition of persons suffering from the diseases from which the testator died. This physician, in the course of his examination, made this statement:

"A person may die of coma from diabetes, and be perfectly conscious, and capable mentally up to within a few moments before death comes."

The court then asked the witness:

"Yes; but is it so ordinarily?"

The witness then explained that in persons of advanced years diabetes is not so fatal as to young persons. The court then asked the witness if the memory was not weakened and the processes of the mind made slower as the person's strength grew less. The witness replied:

"That would be likely to be so with one advanced in years. Yet, I have seen people, for instance, with tuberculosis—
"The Court: I do not mean rare cases.
"The Witness: No; I have seen it very often.
"The Court: It is ordinarily so?
"The Witness: I have seen emaciated, feeble individuals, with a mind alert, active, sharp, infinitely sharper then than during ordinary conditions.
"The Court: Is it generally so?
"The Witness: No; not generally. That is not the rule.
"The Court: Then strike that out, because, as I have said, we do not proceed on the exceptions."

To this ruling the defendants' counsel duly excepted. The evidence, in our opinion, was perfectly competent, and the witness' answer was improperly stricken out. It would be a strange rule of law that confined the testimony of an expert witness to a statement of the general rule alone, without permitting him to also state recognized exceptions to the rule.

In this case, Mr. Thompson died from the effect of diabetes and the hardening of the arteries. One of the claims of the plaintiffs was that the diseases in question caused a dulling of the mental faculties, and rendered the testator incompetent to make a will at the time he did.

On the other hand, the testimony on the part of the defendants was to the effect that, at the time the will in question was executed, he was in fact in possession of all his mental powers, and of sound mind. Physicians for the plaintiffs had testified to the general effects of the disease; nevertheless the rule had its exceptions, and the defendants' claim was that the testator's condition on the day in question was one of the exceptions to the general rule. Nevertheless, the court struck out that testimony, on the ground that "we" (i. e., the court and jury) "do not proceed on the exceptions."

We can conceive of few rulings on questions of evidence more prejudicial to a litigant. We think it clearly erroneous.

The judgment and orders appealed from should be reversed, and a new trial granted; costs to abide the event.

HIRSCHBERG, CARR, and RICH, JJ., concur.

BURR, J. [6] I concur; but, in addition to the grounds for reversal so cogently stated by Mr. Justice WOODWARD in his opinion, I desire to call attention to another serious error of the trial court, that it may be avoided upon the new trial which must be had. The statute provides that, upon the trial of the issues arising in an action of this character, "the decree of the surrogate admitting the will or codicil to probate shall be prima facie evidence of the due attestation, execution and validity of such will or codicil." Code of Civil Procedure, § 2653a. The words "prima facie" are used in two senses, one where the party—

"having the burden of proving the issue (i. e., the risk of nonpersuasion of the jury) has not only removed by sufficient evidence the duty of producing evidence to get past the judge to the jury, but has gone further, and, either by means of a *presumption* or by a general mass of strong evidence has entitled himself to a ruling that the opponent should fail if he does nothing more in the way of producing evidence."

Or to put it in another way:

"Are there facts in evidence which, if unanswered, would justify men of ordinary reason and fairness in affirming the question which the plaintiff [or proponent] is bound to maintain?" 4 Wigmore on Evidence, § 2494.

The other sense in which the words are used relates to a situation where the proponent has introduced sufficient evidence to require the judge to submit the question to the jury. But the proponent—

"still has his burden of proof in the sense of the risk of nonpersuasion of the jury; i. e., should the jury be in doubt, * * * either with or without evidence from the opponent, the proponent fails to obtain their verdict upon that issue, and the opponent remains successful." Id. §§ 2487b, 2494.

That the words were used in the statute in the former sense is clear.

"The party sustaining the will shall be entitled to open and close the evidence and argument. He shall offer the will *in* (sic) probate and rest. The other party shall then offer his evidence. The party sustaining the will shall then offer *his other* evidence." Code of Civil Procedure, § 2653a.

When the party sustaining the will shall have offered the will and the decree of probate, and rested, as the statute compels him to do, if no other testimony is introduced, what of necessity must follow? A verdict from the jury in his favor. The will and the decree, which is the only evidence which proponent is permitted to offer in the first instance, is not only sufficient to require the judge to submit the question to the jury, but it is sufficient, unanswered, to require the jury to be persuaded thereof. It was therefore error to instruct the jury, as was done:

"The probate of it, what the surrogate did, do not allow it to have a feather's weight in your minds as evidence bearing upon that inquiry," viz., "the due attestation, execution, and validity of such will."

That this instruction was not inadvertent is apparent from the fact that in substance it was repeated several times in the course of the trial. The jury were told that the decree of the surrogate—

"has no probative force." "It" (the surrogate's decree) "has nothing to do with it. You must dismiss from your memory and consideration absolutely the fact that anybody has passed on this will before."

Doubtless, after the opponents to the will had introduced their evidence, the decree of the surrogate was not conclusive. But the instruction of the learned trial court compelled the jury to disregard the express provisions of the statute respecting a subject which was within the legislative province. 1 Wigmore on Evidence, § 7; 2 Wigmore § 1354, subd. 3.

CARR, WOODWARD, and RICH, JJ., concur.