1. WILLS—UNDUE INFLUENCE.
It is not enough to establish fraud or undue influence in procuring the execution of a will that those charged with the same were in a situation to practice them.

2. SAME—EVIDENCE.
It is insufficient to show undue influence that the testatrix gave her property to persons not related to her, where her nearest relatives, who lived at a distance from her and were not intimate with her, were cousins and second cousins.

In the matter of the last will of Viola A. Bolles, deceased. Probate decreed.

O. U. Kellogg, for executor.

Horace L. Bronson, for Charles Parker and others.

E. C. Alger, for special guardian.

J. & T. E. Courtney and Dougherty & Miller, for Julia Eastman and Dellphine King, contestants.

Henry C. Walker, for Elmira Beebe, contestant.

T. B. & L. M. Merchant, for John J. Eastman, contestant.

EGGLESTON, S. Among the numerous objections urged by the contestants against the probate of the last will and testament of Viola A. Bolles, deceased, late of Cortland, N. Y., are the following: First, that the will offered for probate was not legally and properly executed; second, that at the time of the making and execution of the will the testatrix was not of sound mind, and was not competent to make a valid will; third, that the will was procured by fraud and undue influence practiced against and upon the testatrix by Frank Ingersoll, Sarah Ingersoll, and Fred D. Ingersoll, or some one of them, or by some person or persons unknown to the contestants. As these are the main objections to the proposed will, it is unnecessary to consider the other objections filed, as they are substantially embodied in the three stated above.

The will bears date March 18, 1899. The testatrix died November 6, 1899. The subscribing witnesses to the will are Henry M. Kellogg, George L. Warren, and Stratton S. Knox, persons who had known Mrs. Bolles, who say she appeared to be in good health, and that, in their opinion, she was of sound and disposing mind and memory, fully competent to make a valid will. The witnesses met at the house of Mrs. Bolles on the evening of March 18, 1899, by her request. The will had been prepared by Judge Knox and read over by Mrs. Bolles prior to the time of the other witnesses coming to the house. The will was signed by the testatrix in the presence of the witnesses, and the witnesses signed in the presence of the testatrix. At the same time she duly declared and published the instrument signed to be her last will and testament, requesting the witnesses to sign it; thus fulfilling the requirements of the statute providing for the due and proper execution of wills. The execution of the will was superintended by a lawyer accustomed to the drawing of wills, and knowing the neces-

sary steps to be taken in the execution of the same. All of the witnesses state that at the time they conversed with Mrs. Bolles she appeared to be in good health, and that, in their opinion, she was of sound and disposing mind and memory,—fully competent to make a valid will. There can be no doubt but that the execution and publication of the instrument have been sufficiently proven to allow the same to be admitted to probate as a valid will.

Upon the question of testamentary capacity many witnesses have been called, and a great amount of evidence taken. Much of the testimony given upon the part of the contestants, offered for the purpose of showing want of testamentary capacity, was not of a convincing nature; and many of the acts and declarations narrated by them, which they characterized as irrational, certainly would not warrant such a conclusion. Especially is that so when viewed in the light of all the evidence in the case. That Mrs. Bolles had some peculiarities or eccentricities, perhaps, is true, but they were not of such a nature as to show an aberration of her mind. In former years she was a person fond of society, interested in her home life, and striving, with her husband, to accumulate a property by which they might be comfortable in the declining days of their lives. Her home was made attractive, and up to the time of her death her chief enjoyment seemed to be in keeping up her home much as it had been kept while she and her husband enjoyed it together. She felt the death of her husband keenly, and ever after his death seemed to cherish a fond remembrance of him; never afterward having quite the same cheerful manner, and never desiring to mingle in society as in former years. Undoubtedly a growing deafness led her to lead a more secluded life, finding comfort in reading and receiving visits from her neighbors, as she frequently spoke of the embarrassment it was to her to be unable to converse easily, attend church, or go out among her friends. Such a condition tends to change the course of one's life,—to make smaller the circle of its pleasures and enjoyments. Indeed, it would cause a person of culture and refinement, having the ordinary amount of pride and fondness for society, to feel that the world had lost much of its brightness; and society would possess but little attraction for such a one. But this does not argue that such a person is lacking in mental power or ability to understand the nature of her acts. Rather, it would tend to show a strength of mind,—an adaptability to adjust oneself to a situation brought about by an infirmity which could not be averted. To her neighbors and immediate friends Mrs. Bolles appeared the lady she had always been, enjoying their visits and conversing with them; and they state that up to the time of her death they observed in her no change in this respect, except such as was brought about by her deafness and advancing years. By the contestants it was sought to be established that the testatrix for several years before her death became penurious to such an extent that she deprived herself of food, lived sparingly, and would not even procure the necessary comforts of life. While there is some evidence tending to show that fact, the truth of it is not borne out in the light of all the evidence given upon the trial. She frequently said that her expenditures were large, and that she felt that she was paying out more money in the keeping

of her home—the running of her farm—than she could afford; and, while there might not have been sufficient cause for alarm that she would come to want, yet that is a feeling which naturally comes to persons whose expenditures are large, and such expressions are often made without apparent foundation. That the farm did not yield an income over the actual expenses probably was true, and she felt that it was a source of trouble and annoyance, as it was difficult for her to personally look after it, and she had to depend largely upon the work of others in the management of the same. Others have had similar experiences, and, under like circumstances, have found that farming was not a profitable investment. It can hardly be said that the disposition made by her of the farm—providing that she should have a yearly sum paid to her during her lifetime without any trouble upon her part— was an unreasonable contract, inasmuch as she felt kindly toward Mr. Saunders, who in return had often aided and advised her in business matters, and at her death she undoubtedly desired him to have the farm. There is, however, another species of evidence in the case, of a convincing character, showing the systematic way with which Mrs. Bolles transacted business after the death of her husband. For several years prior to her death it was her custom, as evidenced by the introduction of checks and receipts, to pay her bills and debts by the giving of checks and taking receipts; filing the same away for future use if needed. The checks were drawn carefully, stating usually for what they were drawn, and upon the corresponding stub in the check book were entered the date, amount, and for what purpose given; the entries and figures being made in her own handwriting. She was exceptionally prompt in the payment of her bills, and the careful manner in which she did it is seldom surpassed even by persons seemingly more accustomed to the transaction of business in a business way. No one could look over this record evidence, which speaks for itself, without being impressed that the mind which controlled the action of the person so doing was clear and sound and accurate in the transaction of such business. Her death was sudden, and her mind had not been impaired by any long-continued sickness. Dr. Dana, the attending physician, who had known her for many years, and had been occasionally called to see her for some slight illness, was called to see her about three hours before her death, and remained with her up to the time of her death. His testimony is that Mrs. Bolles was, up to the time of her death, of perfectly sound and disposing mind and memory, and fully competent to make a valid will. The rule is that, in order to make a valid will, it is essential that the testator has at the time sufficient mental capacity to comprehend perfectly the condition of his property, his relations to the persons who were or should or might have been the objects of his bounty, and the scope and bearing of the powers of his will. Such testator must have sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in relation to them. A testator who has sufficient mental power to do these things is, within the meaning and intent of the statute of wills, a person of

sound mind and memory, and is competent to dispose of his estate by will. Delafield v. Parish, 25 N. Y. 9; Van Guysling v. Van Kuren, 35 N. Y. 70; In re Martin, 98 N. Y. 193. This rule of law, established by the court many years ago, has been so frequently quoted and followed without any material change that it has in our day become ingrafted into and become a part of the law itself, in passing upon the testamentary capacity of the person making a will. Judged by this law, under the evidence in this case, Mrs. Bolles did have, at the time of the making of the proposed will, sufficient testamentary capacity to make a valid will.

The third and remaining objection to be considered is, "Was the proposed will obtained by the fraud and undue influence of Frank Ingersoll, Sarah Ingersoll, Fred D. Ingersoll, or either of them?" As to Mrs. Ingersoll and the son, Fred Ingersoll, it is sufficient answer to say that they never had any conversation with Mrs. Bolles upon the subject, and did not know of the will until after it had been made and executed. To Mr. Ingersoll Mrs. Bolles on one occasion stated the fact that she had made her will, and told him certain of its provisions; giving to him her reasons for the making of certain of the bequests. The reasons given indicated that she had given much thought as to what disposition she would make of her property. Mr. Ingersoll testified that he never in any way tried to influence her concerning her disposition of the property, and the only occasion when it was referred to was the one time, and what Mrs. Bolles said was voluntary upon her part, without any suggestion from himself. The burden rests upon the contestants of proving by a fair preponderance of evidence the allegation of fraud and undue influence. In other words, it must be clearly and satisfactorily proven. That allegation has not been established in this case. The most that could be said is that the persons charged with having procured the will through fraud and undue influence were in a situation where they might have attempted to exercise undue influence. Mr. Ingersoll had been her employé for a number of years. Mrs. Ingersoll had been more than a kind neighbor. She had been a kind friend for many years, doing many acts of kindness for her, and it would not be strange that Mrs. Bolles should appreciate their attention. From his birth the son had been known by Mrs. Bolles. Her husband had given him his name, and frequently they had made him presents, and always seemed to take a kindly interest in his welfare. There had been for many years a very friendly relation between the families; the Ingersolls at one time living near to, and in a house belonging to, Dr. Bolles. But these facts do not prove undue influence. "The undue influence which the law condemns is that which is exercised by coercion, fraud, and imposition, and not such as arises from gratitude, affection, and esteem; and it must amount to the moral coercion which restrains independent action, and destroys the free will and agency of the person against which unlawful artifice is employed." In re Martin, 98 N. Y. 193; In re Vedder, 14 N. Y. St. Rep. 470.

It is urged that the proposed will is peculiar in its provisions, unnatural in the disposition of the property, unmindful of the rights

of heirs and next of kin, and forgetful of all those who were entitled to be remembered by the testatrix. But a partial answer to this criticism is that Mrs. Bolles had no near relatives,—the nearest being cousins and second cousins living at some distance,—and it does not appear that there were ever any intimate social relations existing between them. No special reason is shown why they were objects of her bounty, as they were almost strangers to her, very distantly related, and she was under no special obligations to them. To a nephew of her husband, who is a physician by profession, living in the West, she gave the medical library, a set of the American Encyclopedia, consisting of 18 volumes, and a gold watch, formerly the property of her husband; this gift being made prior to the making of the will. Under the circumstances, she had the right to give her own property to such persons as she might feel to be her friends,—to such persons as she would desire to have it after her death,—and in such a way that would bring satisfaction to herself while living; and her motive for so doing is not to be questioned or pronounced improper. While it is the duty of the court, in the testamentary disposition of property, to zealously guard the rights of the living, and protect them from being deprived of property or rights to which they would be justly entitled but for a will made by a person incompetent to dispose of property in such a manner, or by the fraud or undue influence of certain designing or scheming persons, yet it is the more important duty to see that the expressed wishes of persons of legal testamentary capacity, free and unrestrained in their actions, should be carried out when the lips of those persons are silent in death. There is, there can be, no more sacred duty to perform than the debt we owe to the dead in this respect. Any other course pursued would be disastrous in its results, and would produce a feeling of unrest and dissatisfaction in persons while living, fearing lest they would be left powerless in the free and untrammeled disposition of their property by will. The living have the right to ask and demand that at their decease their expressed wishes in this respect shall be carried out to the letter. That right belongs to the dead, unless by reason of incompetency, fraud, or undue influence, or other good, substantial, and valid reason, the law provides that such a disposition of property cannot be so permitted. Such reasons have not been shown in this case, and the proposed will should be admitted to probate. A decree may be entered accordingly.

Probate decreed.