In the Matter of Proving the Last Will and Testament and Codicil of EMMA BOGARDUS, Deceased.

AMERICAN TRACT SOCIETY and Others, Appellants; MARY BOGARDUS FISHER, Respondent.

Second Department, November 4, 1921.

Wills — probate — undue influence based on letter written to testatrix by her mother — lack of testamentary capacity — failure to establish dates of acts offered as evidence of lack of testamentary capacity — evidence insufficient to establish either undue influence or lack of testamentary capacity.

A will was denied probate upon two grounds: *First*, that it was the result of undue influence based upon a letter which the testatrix's mother, who had been dead ten years, wrote to the testatrix seven years prior to the mother's death; *second*, that the testatrix at the time of making the will was of unsound mind, but the dates of the happenings upon which the state of her mind was based were not definitely fixed. It was not claimed that any living person at or near the time of the making of the will said or did anything to influence the testatrix in the disposition of her estate. She made a perfectly natural will considering her attitude toward her relatives, and their attitude toward her.

On all the evidence, *held*, that there was a failure to establish undue influence or lack of testamentary capacity, and that, therefore, the will should be admitted to probate.

RICH, J., dissents.

APPEAL by the American Tract Society and others, as residuary legatees and beneficiaries under the last will and testament of Emma Bogardus, deceased, from a decree of the Surrogate's Court of the county of Dutchess, entered in the office of said Surrogate's Court on the 16th day of May, 1919, refusing probate to said will and a codicil thereto.

Second Department, November, 1921.          [Vol. 198

*W. H. Van Steenbergh* [*Theodore M. Taft* with him on the brief], for the appellants.

*Henry Kohl* [*Fred E. Ackerman* with him on the brief], for the respondent.

JAXCOX, J.:

The will of the testatrix has been denied probate upon two grounds: *First,* that the will in question is the result of undue influence; *second,* that the testatrix at the time of making the will was of unsound mind. The claim of undue influence in this case is *sui generis.* It is not claimed that any living person at or near the time of the making of the said will said or did anything to influence the testatrix in the disposition of her estate. It is claimed that the testatrix's mother, who had been dead ten years, exercised undue influence over her by means of a letter which the mother wrote her seven years prior to the mother's death. These facts arouse any one's wonder as to how such a result could flow from such a cause.

The testatrix was the daughter of James W. and Mary A. Bogardus, who resided in the city of Poughkeepsie, Dutchess county, N. Y. The family was undoubtedly thrifty, but in moderate circumstances. The father was a saddler. He was an ardent Republican and an enthusiastic abolitionist. The testatrix had one sister, Mary, six and one-half years her junior. In 1860, with the knowledge and consent of her parents, Mary became engaged to a young man named Henry Fisher, who was a student at a school in Poughkeepsie. At the commencement of the Civil War in 1861, Henry Fisher went to Canada and remained there for more than a year. It was said that he went to avoid the draft. He was drafted, however, and sent a substitute. At this time feeling ran very high, and apparently Mr. and Mrs. Bogardus became very much incensed at Fisher for his lack of patriotism and opposed his marriage to their daughter. On Mary's twenty-first birthday, August 6, 1864, she and Henry Fisher were secretly married. The father first learned of the marriage from strangers coming to his shop. He was told his daughter had married a secessionist. Bogardus called his daughter Mary before him and in the presence of his wife and other daughter Emma, told her

" You are a child of mine no longer," and forbade her the house. Mary then went with her husband to live at Sing Sing, now Ossining. In 1866 Mary gave birth to a son who was named " Henry Lee," a highly suggestive name at that time. Shortly after this, a friend of Mary's attempted to effect a reconciliation between her and her father. Mary and her child for this purpose called upon her father, but when he learned the child's name he pointed to the door and told Mary to take the child away. At this time Bogardus was ill and shortly thereafter he died. He left a will in which he gave Mary only $100. Emma he gave $4,000, some personal property, and left $6,000 in trust, the income thereof to Emma for life, with remainder to her issue; failing issue to his wife if living, if not then to the issue of Mary. The bulk of his property, however, he gave to his wife, Mary A. Bogardus. The widow, Mary A. Bogardus, died in April, 1891, and apparently all the property she possessed came to her under the will of her husband. She left a will bearing date October 21, 1884, under which she left practically all of her estate to Emma and left nothing to Mary. To emphasize this discrimination and show that the failure to provide for Mary was not an inadvertence, on the 22d day of March, 1888, she executed a codicil to her will in which she asserted that she made the codicil " to state that my Daughter Mary Fisher is debarred from all interest and share in my Estate because of her disobedient and unfilial conduct." On the 28th day of October, 1884, seven days after making her will, Mrs. Bogardus wrote Emma a letter which she requested her daughter to " keep and read." This letter is filled with good advice, religious and secular. I quote: " Go to Jesus with every great and little care, for of all means of growth, prayer is the most important." " Live economically; every year save something of your income, in case your securities do not yield dividends, or become worthless." " Give whatever there is left when God calls you away back to the Lord. Either the American Bible or the American Tract Societies which are always doing the Lords work; mind and give them their proper names, for sometimes ' legacies ' are diverted from the donors intention by such inadvertence." " After Mary you have no relatives to care

for in that way; try in some way to keep trace of her, and should she become needy, it will be your duty to do something for her." Then follows much advice as to the true principles upon which a Christian life should be founded. I quote the last three paragraphs:

" Be earnest; you will find professors every where going and coming, but never advancing one step in that growth in Grace which our Saviour demands. To believe Christ is so precious, that he is never out of mind or sight.

" These last words my dear Child speak to you from the grave, and from the eternal world. I know the utter loneliness which you will feel when you realize that your last earthly friend has gone forever therefore I have written these lines, both to direct and comfort you.

" Reach forward to the heavenly things, and remember that whatever this life has in store for you, that there is a house not made with hands into which your brothers and parents have already entered, and are waiting for you. May God bless you and make you a blessing, is your mothers last wish."

Apparently the mother's thoughts were at this time fixed upon death, but she did not depart this life until seven years later. During this time mother and daughter exchanged many letters of cheerful import. It is this letter filled with Christianlike and motherly advice which the learned surrogate finds unduly influenced testatrix. This letter and her will and codicil make it clear Mrs. Bogardus did not wish any of her property to go to her daughter Mary unless she became needy, and there is no proof that she became needy. Was this undue influence? The property was hers and she could do absolutely as she saw fit with it. She could have given it to Emma and in the instrument by which she gave it limited Emma's power of disposition so that none of it could be given to Mary. Or she could have limited Emma's power of disposition to certain or any religious or charitable organization. Such a limitation would have been absolutely legal. Can it be, then, that a mere request, no matter how solemn the terms in which it is expressed, imposes an illegal burden upon the donee? Surely not. It is difficult to conceive how under the circumstances here disclosed this mother could be guilty

of undue influence which would vitiate her daughter's will. As long as Mrs. Bogardus lived, her will was ambulatory, the property hers, and she could change the disposition of it as she saw fit.  Without giving any reason therefor, she could have exacted a promise from her daughter to dispose of the property any way the mother desired.  If she gave a reason, it would not matter if the reason was false.  The reason would not be the consideration for the promise the gift would be.  I think it may be safely said that a donor prior to the time a gift becomes absolute may use all the influence she desires as to the future disposition of the subject of the gift without that influence being considered undue.  Conditions which may be legally imposed as part of a contract may safely be made the condition of a request.  The conclusion to be drawn from the cases is that undue influence consists in exerting upon the testatrix an improper influence, whether fraudulent, threatening or coercive, *so as to effect a change* in the disposition the testatrix desired to make of her property, so that the will made is one which, if uninfluenced, she would not have made.  (*Matter of Bolles*, 37 Misc. Rep. 562, 568; *Matter of Martin*, 98 N. Y. 193.)  Quite recently this court in *Matter of Ruef* (180 App. Div. 203, 205) reiterated the rule laid down in *Children's Aid Society* v. *Loveridge* (70 N. Y. 387), that " In order to avoid a will on the ground of undue influence, ' it must be shown that the influence exercised amounted to a moral coercion, which restrained independent action and destroyed free agency, or which, by importunity which could not be resisted, constrained the testator to do that which *was against his free will and desire,* but which he was unable to refuse or too weak to resist.' "  In this case no such situation ever existed.  The testatrix's independent action was not restrained.  She was subjected to no importunities. There is nothing to indicate that the testatrix had any desire to do anything other than she did do.  Nothing to show that she ever had any intention of disposing of her property in any other way.  All that appears is that the testatrix's mother made a perfectly proper request and the testatrix's will is in accord with that request.  The will was not an unnatural one. There is no evidence of any affection between the testatrix and her sister.  On the contrary, the testatrix was jealous

Second Department, November, 1921. [Vol. 198

of her sister and showed a strong dislike for her prior to her marriage, and after the final rupture between Mary and her family the sisters never saw or communicated with each other. Apparently the testatrix was as deeply incensed with Mary as were her parents. The letter in question says nothing against Mary and makes no direct request that she be given nothing. It does request the testatrix to " keep trace " of her and to help her if she was in need. The letter indicates knowledge of a fixed determination upon the part of the testatrix to give nothing to Mary, and seeks to prevent the bestowal of testatrix's property upon unworthy objects. It showed no malice toward Mary. If the bed of Mary's own making was not too uncomfortable, she would permit her to lie in it. That was all. Not an unkind word. The burden of establishing undue influence was on the contestant (*Matter of Ruef, supra*), and she failed to sustain that burden.

The determination as to the testatrix's lack of mental capacity is based principally upon the testimony of a large number of witnesses as to many minor occurrences which generally take their color from the mental attitude of the witness. Beginning prior to the mother's death, they embrace all sorts of subjects, such as the fact that the mother and daughter did not live together, the daughter did not exhibit a sufficient amount of grief at her mother's death; that the mystery of death was not sufficiently appalling to her to prevent her from at once occupying the room in which her mother died; that she prepared her mother's body for burial and combed her hair in a different manner from that in which the mother had usually worn it; that she wore no mourning for her mother, permitted no token of death to be placed upon the outside of the house and saved a portion of the dress skirt in which her mother was buried to make some article of clothing for herself; that she issued invitations for the funeral and sent them to people whom the witnesses had never known to call upon the mother; that she wore bright colored clothes and used cosmetics to an extent which was conspicuous; that she changed lawyers without any reason being apparent to the witness; that she changed executors in her will, also without apparent reason, and numerous other instances of a similar character. These are all without significance. That the

mother and daughter did not live together might be the result of many causes, but if explanation were necessary I think it is sufficient that the evidence shows that when the testatrix was a student at boarding school her mother did not permit her to receive letters from any one but herself, and if unreasonable why not attribute it to the mother? As to the lack of outward signs of grief at her mother's death, I think it is common observation that persons of the religious character of this mother and daughter do not consider death any cause for mourning. That the daughter desired to assist in preparing her mother's body for burial was, I think, indicative of her affection for her, and the manner in which she combed her hair showed a desire to have her mother look as attractive as possible. Notices of death and time and place of the funeral are not at all unusual. The relations existing between the persons to whom these notices were sent and Mrs. Bogardus were entirely a matter of guesswork.

There is another class of incidents testified to in which it is stated that the testatrix did not want her business to be known — instructed her brokers to communicate with her in envelopes which did not bear a business card; that the testatrix said she was being watched and hung clothes over the key hole, stuffed cloths into cracks, etc., to prevent being watched; that at one time she got upon a table to look out of the transom to see if she was being watched; that she ate her meals in her room; that she went to Wanamaker's restaurant for dinner night after night and had the same thing for dinner each time. This is not intended to be a recital of all the acts of this kind testified to, but it is sufficient to indicate the character of the acts upon which a finding of mental incapacity is necessarily predicated. In this particular case evidence of this character is subject to a weakness which does not always exist. In September, 1903, there was a marked change in the testatrix's mental and physical condition. Although for years she had been a voluminous correspondent, her letters had been indicative of health and mental capacity. At this time, however, they excited the fears of her friends, and when they called upon her they found her ill. Doctors were called and she was sent to a hospital. After some time in the hospital she went to a sanitarium in Pennsylvania. At

this time, however, the testatrix retained sufficient knowledge of her affairs to inform a friend where her will could be found, who the executors were, and to give her a list of the property which she possessed. She apparently did everything that a perfectly normal person would have done in preparation for illness or death. No matter what construction the witnesses seek to place on her condition at that time, it is apparent that they then considered her competent. Her business affairs were discussed with her and she was permitted to execute a power of attorney. It is, however, plain beyond controversy that there was a conspicuous change in the testatrix's condition, mental and physical. In 1906 a proceeding was instituted in which the testatrix was declared to be incompetent to manage herself or her property. The will in question here is dated the 26th day of May, 1900. I do not consider the codicil of any consequence, as it did not dispose of any property. As the testatrix at some time in her life undoubtedly became incompetent, numerous irrational acts upon her part have been observed and that gives rise to the difficulty of determining when the acts observed took place. Did they occur prior to or near the time of making the will in question so as to throw some light upon the testamentary act? Many of the witnesses frankly admit the difficulty of remembering dates and their uncertainty as to the dates when the occurrences testified to happened. Others say that their memories are good as to everything except dates. Some fix dates with apparent certainty, but other parts of their testimony indicate that their certainty is only apparent. This testimony is, therefore, subject to this weakness — that the date of the happenings cannot be definitely fixed, and the dates are vital.

In addition to this class of testimony the contestants gave both medical and lay testimony as to the testatrix's condition from September, 1903, to the date of her death in 1915. Upon this testimony and the other classes of testimony to which I have referred, hypothetical questions were framed and sub-. mitted to experts, who testified that in their opinion the testatrix was mentally incompetent to make a will at the date when this will was made. In arriving at this conclusion, of course, the date when the incidents recited in the hypothetical

question occurred are of the utmost importance. If these incidents occurred later than stated in the hypothetical question, it is clear that the diseased condition of mind which it is claimed they indicated was not present until a later date.

In opposition to this testimony it was shown that the testatrix made a perfectly natural will considering her attitude toward her relatives and their attitude toward her. The surviving witnesses to the will and codicil — both men of experience — testify that at the time of the execution of the will and codicil the testatrix was of sound mind. The law looks with favor upon the testimony of the attesting witnesses. They have an opportunity of observation which no one else has, and their conclusion that the testatrix was at the time mentally sound should not be lightly disturbed. During all the period covered by the testimony hereinbefore referred to, the testatrix showed a complete grasp of the business of her estate. She knew when, where and how her money was invested; she knew when the interest was due; she was able to tell whenever any interest was unpaid or when her agent failed to remit, and no matter how many items were remitted to her at one time or how jumbled the accounts might be, she knew how the account should be and could state it clearly and correctly. She had many friends with whom she corresponded. She was interested in all the questions of the day, read the papers and the magazines, commented intelligently in all her letters upon matters of public interest, took a deep interest in church work, attended church frequently and commented in a thoughtful and logical manner upon the sermons she heard and the persons who preached. She was interested in charities and interested in the very societies which are now made the objects of her bounty. Her charities show care, discrimination and thoughtful attention. She made friends and kept them — friends of intelligence and refinement. Her letters show unmistakably that during the period when it was claimed she was of unsound mind she was a careful and intelligent person in so far as the management of her affairs was concerned and in the other respects hereinbefore referred to. In regard to this proof there can be no mistake as to the dates. These letters and other documents show that

she was of sound mind long past the date when her will was made.

The proponent called an expert witness to whom also was propounded a hypothetical question embracing the testimony in the case from the proponent's point of view, and upon this the witness gave his opinion that the testatrix was of sound mind.

The conclusion that the testatrix was of unsound mind is contrary to the weight of evidence.

The decree of the Surrogate's Court of Dutchess county should be reversed and the will should be admitted to probate, with costs to all parties appearing separately, payable out of the estate.

MANNING, J., concurs; BLACKMAR, P. J., and MILLS, J., concur in the result; RICH, J., dissents.

Decree of the Surrogate's Court of Dutchess county reversed and will admitted to probate, with costs to all parties appearing separately, payable out of the estate.